1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    MICHAEL JAMES FAULKNER,                    No.  2:15-cv-01485 KJM DB P

12                       Petitioner,

13         v.                                     FINDINGS AND RECOMMENDATIONS

14    E. VALENZUELA,[1]

15                       Respondent.

16

17         Petitioner, Michael James Faulkner, is a state prisoner proceeding pro se and in forma

18    pauperis with a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges

19    a judgment of conviction entered against him on April 23, 2013 in the Shasta County Superior

20    Court for one count of criminal threats and one count of battery.  (Doc. 10 at 323.[2])

21         Petitioner seeks federal habeas relief on the following grounds:  (1) the trial court

22    committed prejudicial error when it overruled his objection to Officer Jerry Fernandez's

23    testimony that victim Megan Burkett was in sustained fear; (2) the cumulative prejudicial effect

24    of two critical errors violated his due process rights; (3) the prosecutor violated his constitutional

---

[1]  The originally named respondent, E. Valenzuela, is no longer warden of the prison in which
petitioner is incarcerated.  Therefore, Josie Gastelo should be substituted as the proper respondent
in this action.  Fed. R. Civ. P. 25(d); see also (ECF No. 16 at 8 n.1.)

[2]  "Doc." refers to the series of documents (Doc. 1, Doc. 2, etc.) that the state lodged with the
court and that do not appear on the electronic filing system.

1

rights through his charging decisions and failure to excuse a biased juror; and (4) his trial and appellate counsel were ineffective.  (ECF No. 1 at 4–5.)  As discussed below, petitioner's habeas petition should be denied.

## I.    BACKGROUND

### A.    Factual background

In an unpublished opinion affirming petitioner's conviction, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> On the night of August 4, 2012, [petitioner's] sister, Megan, called 911 and reported her brother had just punched her in her face and choked her.  When Megan told [petitioner] she was going to call the police, he ran into the kitchen, then back to Megan's room and tried to stab her.  [Petitioner] then "peeled out" of the house in their father's truck.  Megan advised the 911 dispatcher her brother left the house with a small kitchen knife, might still be on parole, was on antipsychotic medication, and had been drinking.

> Shasta County Deputy Sheriff Jerry Fernandez responded to the scene and met Megan in the driveway.  She appeared upset, in fear, and was almost in tears.  She was very worried about where [petitioner] was and whether the police could locate him.  On her left cheek there was some swelling, bruising, and redness.

> Megan reported to [Officer] Fernandez that [petitioner] had punched her.  When she told [petitioner] she was calling the police, he choked her in a headlock, ripped the phone from her hand and threw it to the ground.  She ran and locked herself in a bedroom.  [Petitioner] got something from a drawer in the kitchen; she believed he would use that utensil to harm her.  [Petitioner] threatened Megan through the door yelling, "Oh you think you're going to send me back to prison?  I'll stab that bitch."  "I'll stab you if you call nine-one-one because I'm not going back to prison."  [Petitioner] then tried to force his way into the room with a knife.  [Officer] Fernandez observed fresh damage to the bedroom door.  The doorjamb was broken and there were nicks in the door which were consistent with someone trying to pry it open with a knife.

> Megan reported she called 911 because she was afraid of [petitioner's] threats to stab her.  Deputy Fernandez was with Megan for at least 30 minutes.  During that entire time, she appeared to remain frightened, upset, worried, and on the verge of tears.  She asked what she could do to protect herself from [petitioner].  She asked [Officer] Fernandez to try to find [petitioner] so "he wouldn't be out and she would be safe."

> Megan's sister-in-law, Nicole Faulkner, was also at the scene.  [Officer] Fernandez interviewed her.  Her story largely coincided with Megan's.  After the disturbance, Megan ran to the bedroom and [petitioner] ran to the kitchen.  He ran toward the

bedroom with a large kitchen knife, pounded on the door and yelled, "'I'll stab that bitch.  I'll stab that bitch.'"  He then used the knife to try to pry the door open, while Megan was screaming that [petitioner] was trying to stab her.

At trial, Megan was an uncooperative witness and recanted some of her earlier statements.  She testified that she and Erica Leeper, her best friend's younger sister, had been at her parent's house on the porch with [petitioner].  She believed [petitioner] was on drugs at the time.  He wanted to take Erica to a bar, but Megan told Erica not to go and Megan and [petitioner] argued about that.  [Petitioner] and Megan started shoving each other around, and at some point he either pushed, punched, or slapped Megan on the cheek.  [Petitioner] blocked her from going into the house and Megan grabbed the phone and threatened to call the police and their parents.  [Petitioner] went to the kitchen and Megan thought he was getting something to harm her, so she ran to the bedroom and locked the door.  She called the police.  [Petitioner] tried to unlock the bedroom door with a small kitchen knife, but did not damage the door.  She also testified [petitioner] never threatened to stab or kill her.  She told the police he had threatened her so the police would arrest [him], because he was high on drugs.  Megan testified she was afraid [petitioner] would harm her or himself because of his drug use, not because he had threatened her.

Nicole was in the house when one of her children came to her and told her Megan needed her.  She opened the door to let Megan in the house.  Megan appeared jumpy, frantic, and frustrated.  Inside the house, [petitioner] and Megan were yelling at each other.  A few minutes later, Megan ran down the hall into the bedroom and [petitioner] ran into the kitchen and came back with a small kitchen knife.  [Petitioner] tried to unlock the door with the knife.  Megan was "screaming and going crazy" because she was afraid.

Erica also testified that [petitioner] got mad at Megan for interfering in their plan to go to the bar.  She did not see [petitioner] punch Megan, but saw her fall to the ground while [petitioner] stood in front of her.  Megan said she was going to call the police and [petitioner] tried to grab the phone from her.  Erica denied that [petitioner] put Megan in a choke hold or "smacked" the phone out of Megan's hand, although she told [Officer] Fernandez he had done both.

Erica testified that when Megan got inside the house, she was angry.  [Petitioner] ran to the kitchen and Megan ran into the bedroom.  [Petitioner] came out of the kitchen with a large white-handled knife.  Erica went outside.  [Petitioner] came outside with the knife still in his hand, and said, "'She's trying to call the police and tell them I'm going to stab her.'"  [Petitioner] then left in a white truck.

[Petitioner] was arrested later that evening.  Deputies did not find a knife in the vehicle.  [Petitioner] did not appear to be under the influence of alcohol or drugs.  The truck was released to Megan and her husband.  Upon picking up the truck,

////

3

1
2
> Megan appeared very worried, her voice was shaking and she was trembling and she expressed concern about whether [petitioner] would be released from jail soon.

3 People v. Faulkner, 2014 WL 1678611, at *1–2 (Cal. Ct. App. Apr. 29, 2014).[3]

4 **B.     Deference to Court of Appeal's factual findings**

5 On federal habeas review, "[f]actual determinations by state courts are presumed correct

6 absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340

7 (2003) (citing 28 U.S.C. § 2254(e)(1)); see also Davis v. Ayala, 135 S. Ct. 2187, 2199–2000

8 (2015) (citation omitted) ("State-court factual findings . . . are presumed correct; the petitioner

9 has the burden of rebutting the presumption by clear and convincing evidence."). "This

10 presumption applies even if the finding was made by a state court of appeals rather than by the

11 state trial court." Pollard v. Galaza, 290 F.3d 1030, 1035 (9th Cir. 2002) (citation omitted).

12 Thus, unless the petitioner submits clear and convincing evidence to the contrary, a

13 federal habeas court may rely on a state appellate court's recitation of the facts to rule on a habeas

14 petition. Id. This procedure is particularly appropriate where, as here, the petitioner "has [not]

15 challenged these findings." Slovik v. Yates, 556 F.3d 747, 749 n.1 (9th Cir. 2009); see also

16 Runningeagle v. Ryan, 686 F.3d 758, 763 n.1 (9th Cir. 2012); Moses v. Payne, 555 F.3d 742, 746

17 n.1 (9th Cir. 2009); Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008).

18 **C.     Procedural background in state court**

19 "[Petitioner] was charged with criminal threats, battery, and damage of a wireless device."

20 Id. at *2. "The information further alleged a prior strike conviction and a prior prison term." Id.

21 "Following trial, a jury found [petitioner] guilty of criminal threats and battery, and not guilty of

22 damage of a wireless device." Id. "In bifurcated proceedings, the trial court found the

23 enhancement allegations true." Id. "After denying [petitioner's] motion to strike his prior

24 conviction and reduce the criminal threats conviction to a misdemeanor, the trial court sentenced

25 petitioner to the upper term of three years on the criminal threats conviction, doubled to six years

26 because of the prior strike conviction, plus five years for the serious felony enhancement, and one

27

28 [3]  The state has lodged a copy of the Court of Appeal's opinion with the court.  (Doc. 4.)

1   year for the prior prison term enhancement." Id. "The trial court also sentenced petitioner to a

2   concurrent six-month term on the misdemeanor battery conviction." Id.

3       On appeal, petitioner contended that "the trial court prejudicially erred in admitting, over

4   objection, [Officer Fernandez's] testimony that the victim was in 'sustained fear.'" Id. Further,

5   he contended that "the cumulative effect of that error, combined with testimony that suggested

6   [he] was in custody, was prejudicial." Id. On April 29, 2014, the Court of Appeals issued its

7   unpublished opinion rejecting these arguments and affirming the trial court's judgment. Id. at *1,

8   3–6. Petitioner did not raise claims (3) and (4) of his federal habeas petition in the Court of

9   Appeal. Compare id. at *1, with supra pp. 1–2. On July 25, 2014, the California Supreme Court

10  denied his petition for review without comment. (Doc. 6.)

11      On July 9, 2015, petitioner filed a habeas petition in the California Supreme Court. (Doc.

12  7.) Therein, he raised claims (3) and (4). Compare id., with supra pp. 1–2. On October 28, 2015,

13  the petition was denied without comment. (Doc. 8.)

14      **D.      Procedural background in federal court**

15      On July 10, 2015, petitioner filed a habeas petition in the Eastern District of California.

16  (ECF No. 1.) Therein, petitioner asserted the following claims: (1) the trial court committed

17  prejudicial error when it overruled his objection to Officer Fernandez's testimony that Megan was

18  in sustained fear; (2) the cumulative prejudicial effect of two critical errors violated his due

19  process rights; (3) the prosecutor violated his constitutional rights through his charging decisions

20  and failure to excuse a biased juror; and (4) his trial and appellate counsels were ineffective. (Id.

21  at 4–5.)

22      Petitioner acknowledged therein that claims (3) and (4) were unexhausted. (Id. at 5.)

23  Thus, the court ordered him to file a motion for stay and abeyance or an amended petition

24  containing only his exhausted claims. (ECF No. 8 at 4.)

25      On November 8, 2015, he filed a motion for a stay. (ECF No. 10.) Then, on December

26  11, 2015, he notified the court that he had exhausted claims (3) and (4). (ECF No. 11.)

27      On January 6, 2016, the court ordered the state to respond to the petition within sixty days.

28  (ECF No. 12.) The state has filed its answer. (ECF No. 16.) Petitioner has not filed a reply, or

1    traverse, which is not obligatory.  Rule 5(e), Rules Governing Section 2254 Cases ("The

2    petitioner may submit a reply to the respondent's answer or other pleading within a time fixed by

3    the judge."); see also id. advisory committee's note ("Rule 5 . . . does not contemplate a traverse

4    to the answer, except under special circumstances.").

5    **II.      STANDARD OF REVIEW**

6          An application for a writ of habeas corpus by a person in custody under a judgment of a

7    state court can be granted only for violations of the Constitution or laws of the United States.  28

8    U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

9    application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010) (per curiam); Estelle v.

10   McGuire, 502 U.S. 62, 67–68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

11         Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

12   corpus relief:

13        An application for a writ of habeas corpus on behalf of a person in custody
          pursuant to the judgment of a State court shall not be granted with respect to any
14        claim that was adjudicated on the merits in State court proceedings unless the
          adjudication of the claim —

15
16             (1) resulted in a decision that was contrary to, or involved an
               unreasonable application of, clearly established Federal law, as
17             determined by the Supreme Court of the United States; or

18             (2) resulted in a decision that was based on an unreasonable
               determination of the facts in light of the evidence presented in the
19             State court proceeding.

20   Under § 2254(d)(1), "clearly established Federal law" consists of Supreme Court "precedents as

21   of the time the state court renders its decision."  Greene v. Fisher, 565 U.S. 34, 38 (2011) (citation

22   and emphasis omitted); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v.

23   Taylor, 529 U.S. 362, 412 (2000)).  Yet "circuit court precedent may be persuasive in

24   determining what law is clearly established and whether a state court applied that law

25   unreasonably."  Stanley, 633 F.3d at 859 (citation omitted).  However, circuit court precedent

26   may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a

27   specific legal rule that [the Supreme] Court has not announced."  Marshall v. Rodgers, 133 S. Ct.

28   1446, 1450 (2013) (per curiam) (citations omitted).

6

Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct." Id. at 1451 (citations omitted). Furthermore, if courts of appeals have "diverged widely" in their treatment of an issue, it cannot be said that "clearly established Federal law" governs that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

Under § 2254(d)(1), a state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (citations omitted).

Under § 2254(d)(1)'s "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (citation omitted); accord Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).

A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Williams, 529 U.S. at 411. "Rather, that application must also be unreasonable." Id.; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citation omitted) ("The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); Lockyer, 538 U.S. at 75 (citation omitted) ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous."). Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted). In other words, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification

////

7

1   that there was an error well understood and comprehended in existing law beyond any possibility

2   for fairminded disagreement." Id. at 103.

3          If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

4   court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford,

5   527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

6   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

7   2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

8   de novo the constitutional issues raised.").

9   **III.    ANALYSIS**

10          **A.    Did the trial court commit prejudicial error when it overruled
              petitioner's objection to Officer Fernandez's testimony that Megan
11             was in sustained fear of petitioner**

12

13                 1.    Petitioner's argument[4]

14          Here, as in the Court of Appeal, petitioner "contends the trial court erred in admitting into

15   evidence [Officer] Fernandez's testimony that Megan was in 'sustained fear.'" Faulkner, 2014

16   WL 1678611, at *3. "He contends this testimony was improper opinion testimony." Id. To

17   support this contention, he notes that sustained fear is an element of the offense of criminal

18   threats, i.e., "the requisite mental state of the victim." Faulkner, 2014 WL 1678611, at *3; see

19   also Cal. Penal Code § 422(a). Further, he contends that "police officers may not testify as to

20   another person's state of mind." Id. Thus, he concludes that "Fernandez's testimony was an

21   [improper] opinion on the ultimate fact of [his] guilt." Faulkner, 2014 WL 1678611, at *3; (see

22   also ECF No. 1 at 8–10.) Consequently, in his assessment, "this erroneous admission of evidence

23   going to a central element of the question of guilt or innocence was so prejudicial as to constitute

24   a denial of due process." (ECF No. 1 at 12.)

25   ////

26   ////

27   ─────────────────────
     [4]   Defense counsel conceded that petitioner was guilty of battery. (Doc. 11 at 292.) Therefore,
28   his claims pertain to the conviction for criminal threats.

2.      Officer Fernandez's testimony

At petitioner's trial, Officer Fernandez offered the following relevant testimony.  The testimony pertained to "Megan's physical demeanor the night of the incident."  Faulkner, 2014 WL 1678611, at *3.

> "[PROSECUTOR]: Can you tell us—tell the jury [Megan]'s physical demeanor when you first saw her that night?
>
> "[FERNANDEZ]: Um, almost to the point of tears.  She was definitely upset. Really worried about what the petitioner was—where he was, if we would locate him.  I would suggest sustained fear.
>
> "[DEFENSE COUNSEL]: I object to that last comment, your Honor.  Lack of foundation and speculative.  It is an opinion.  I'll move to strike it.  Ask the Court to admonish the jury to disregard it.
>
> "THE COURT: Overruled.  That is within the ability of the percipient witness to evaluate, in my opinion.  So I'll allow it."
>
> The testimony continued,
> "[PROSECUTOR]: From the time you first arrived at the location . . . and met with [Megan]—when you first arrived, did she have that physical manifestation that you described?  Almost in tears-type of fear when you first got there?
>
> "[FERNANDEZ]: Yes.
>
> "[PROSECUTOR]: How long did you remain at that location when you first began investigating this case?
>
> "[¶] . . . [¶]
>
> "[FERNANDEZ]: No less than 30 minutes.
>
> "[PROSECUTOR]: And in the time you were at that location, did [Megan] remain, as well?
>
> "[FERNANDEZ]: Yes, she did.
>
> "[PROSECUTOR]: Did you have continued interaction with her during that portion of your investigation?
>
> "[FERNANDEZ]: Yes.
>
> "[PROSECUTOR]: During that time, did it appear that her physical fear—the manifestation of her fear lessened at all while you were there?

9

"[FERNANDEZ]: No.

"[PROSECUTOR]: She remained scared the whole time?

"[FERNANDEZ]: Yes.

"[PROSECUTOR]: While you are there, did she ask you in any way if there is anything that you could do to protect her and her family from the petitioner?

"[FERNANDEZ]: Yes, she did.

"[PROSECUTOR]: What did she say?

"[FERNANDEZ]: She asked lots of questions.  Due to there being family there— sister-in-law, sister's friend, the manner in which the incident occurred, um, she was pretty fearful.  She did not want to leave her sister-in-law there, her friend there.  [¶]  [S]o I informed her of all her courses of action that she could do, such as—well you know, maybe you can go home.  That wasn't an option because her sister-in-law was still there.  She didn't want [petitioner] to come back and her be there by herself.

"[¶] . . . [¶]

"[PROSECUTOR]: And after her husband arrived, did [Megan]'s—the physical manifestations of her fear change or lessen at all?

"[FERNANDEZ]: No.

"[PROSECUTOR]: She remained afraid even when her husband showed up?

"[FERNANDEZ]: Yes.

"[PROSECUTOR]: And did she ask you to try to find the [petitioner] so he wouldn't be out and she would be safe?

"[FERNANDEZ]: Yes."

Faulkner, 2014 WL 1678611, at *3 (most alterations in original).

### 3.    Trial court's response to petitioner's objection

The trial court rejected petitioner's argument that Officer Fernandez's testimony was an

improper opinion that Megan was in sustained fear.  The trial court reasoned:

[T]he Defense objected to the People inquiring of the current witness of his opinion concerning whether the victim was in fear when he interviewed her.  That objection was overruled because the current witness testified about indicia that led him to that opinion.  Physical indicia . . . of the victim and the surrounding

10

circumstances.  And it is well within the ability of a percipient witness to render such an opinion.  [¶]  I do note, however, the opinion testimony instruction 333 is not included in the People's instructions and that should be included.  And that very adequately explains how the jury can deal with such opinion testimony.

Faulkner, 2014 WL 1678611, at *3.

### 4.    The Court of Appeal's response to petitioner's objection

The Court of Appeal declined to rule on whether the trial court improperly admitted Officer Fernandez's opinion testimony.  The Court stated that, while "nonexperts are allowed to state opinions in limited situations," the propriety of the testimony was a "close question."  Id. at *4.  Instead, it held that "even if there was error, the error was harmless."  Id. (citations omitted). In holding that the alleged error was harmless, it reasoned:

> There was ample evidence of Megan's fear and its extent.  Nicole testified Megan was screaming and "going crazy" because she was so afraid of [petitioner].  The jury heard Megan's 911 call and the tone of her voice five minutes after [petitioner] left the property.  [Officer] Fernandez testified as to Megan's appearance, demeanor, and behavior; the physical manifestations of her fear. When he arrived at the scene 15 to 20 minutes after the 911 call, Megan appeared to be in fear, she was "definitely upset" "almost to the point of tears."  [Officer] Fernandez was with her for at least 30 minutes and during that entire time, those physical manifestations of fear did not lessen.  Megan told [Officer] Fernandez she was afraid her brother was going to stab her.  She also asked [Officer] Fernandez to find [petitioner] so she would be safe.  The evidence reflects Megan was in fear from [petitioner]'s threat for at least one hour after defendant left the property. Although not defined in Penal Code section 422, the term "sustained fear" has been defined by case law as "a period of time that extends beyond what is momentary, fleeting, or transitory."  (People v. Allen (1995) 33 Cal. App. 4th 1149, 1156; In re Ricky T. (2001) 87 Cal. App. 4th 1132, 1140; People v. Fierro (2010) 180 Cal. App. 4th 1342, 1349; CALCRIM No. 1300.)  The evidence strongly supports the conclusion Megan was in sustained fear.  Based on this record, it is not reasonably probable that the result would have been different in the absence of any error in admitting [Officer] Fernandez's opinion testimony. (Watson, at p. 836.)

Id.

### 5.    Discussion

The Court of Appeal declined to decide whether Officer Fernandez's opinion testimony that Megan was in sustained fear was improper under state law and did not make any express ruling on petitioner's federal constitutional claim.  Instead, it expressly rejected petitioner's first

11

1   claim only under a harmless error analysis.  Because § 2254(d) requires this court to review the

2   Court of Appeal's decision on the federal constitutional claim, this court must determine what

3   that decision is.  The court finds two possible ways to interpret the state court's silence on the

4   federal constitutional issue here.  First, the Supreme Court has held that where a state court

5   decision on a petitioner's claims rejects some claims but does not expressly address a federal

6   claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was

7   adjudicated on the merits.  Johnson v. Williams, 133 S. Ct. 1088, 1091 (2013).  A second way to

8   look at the state court's decision is to assume its harmlessness determination applied to all legal

9   arguments made in this claim.  This court addresses both of these possible state court decisions

10   below.

11                              a.   Due process claim

12          Assuming the state court rejected petitioner's due process claim on its merits, then this

13   court must determine whether rejection of that claim was contrary to, or an unreasonable

14   application of, clearly established federal law.  It is well established that "federal habeas corpus

15   relief does not lie for errors of state law."  Estelle, 502 U.S. at 67 (citing Lewis v. Jeffers, 497

16   U.S. 764, 780 (1990)); see also Wilson, 562 U.S. at 5; Pulley v. Harris, 465 U.S. 37, 41 (1984);

17   Park, 202 F.3d at 1149; Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  Thus,

18   whether a petitioner's "due process rights were violated by the admission of evidence . . . .  is

19   [usually] no part of a federal court's habeas review of a state conviction."  Id.; see also Rhoades

20   v. Henry, 638 F.3d 1027, 1034 n.5 (9th Cir. 2011) ("[E]videntiary rulings based on state law

21   cannot form an independent basis for habeas relief.").

22          Nonetheless, the erroneous admission of evidence at trial may violate due process if "the

23   evidence so fatally infected the proceedings as to render them fundamentally unfair."  Jammal,

24   926 F.2d at 919; accord Gonzalez v. Knowles, 515 F.3d 1006, 1011 (9th Cir. 2008).  However,

25   "[t]he Supreme Court has made very few rulings regarding the admission of evidence as a

26   violation of due process."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).  Indeed,

27   while habeas courts should issue a writ "when constitutional errors have rendered the trial

28   fundamentally unfair," the Supreme Court "has not yet made a clear ruling that admission of

1    irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

2    issuance of the writ." Id. (citation omitted).

3           Here, the Court of Appeal reasonably concluded that any error caused by Officer

4    Fernandez's opinion testimony that Megan was in sustained fear did not affect the outcome of

5    petitioner's trial.  Office Fernandez provided properly admissible testimony regarding Megan's

6    physical manifestations of fear: she appeared to be in fear fifteen to twenty minutes after the 911

7    call; she appeared upset and was almost in tears; she stayed that way for at least thirty more

8    minutes; she said that she was afraid that her brother was going to stab her; and she asked Officer

9    Fernandez to find petitioner so that she would be safe.  Additionally, Nicole testified that Megan

10   was "going crazy" because she was so afraid of petitioner, and the jury heard Megan's voice in a

11   911 call shortly after he threatened to stab her. The trial court's instructions to the jurors further

12   ameliorated any prejudicial effect of Officer Fernandez's testimony.  The trial court instructed the

13   jurors that they did not have to accept Officer Fernandez's lay opinion testimony as "true or

14   correct" and that they could give it "whatever weight [they deemed] appropriate." Faulkner, 2014

15   WL 1678611, at *4.  Further, the trial court instructed the jurors that they could "disregard all or

16   any part of [Officer Fernandez's] opinion that [they found] unbelievable, unreasonable, or

17   unsupported by the evidence." Id.

18          Moreover, petitioner has not identified any controlling cases holding that such an alleged

19   error has rendered a trial fundamentally unfair, and the court knows of none.  See Holley, 568

20   F.3d at 1101.  Accordingly, the Court of Appeal's rejection of his first claim was not contrary to,

21   or an unreasonable application of, clearly established federal law.

                                  b.   Harmless error

23          If the court considers the Court of Appeal's harmlessness determination to apply to the

24   federal constitutional issue, then the court must decide if a determination that any due process

25   error was harmless was contrary to, or an unreasonable application of, clearly established federal

26   law.  See Ayala, 135 S. Ct. at 2199 (section 2254(d) applies to a state court's harmlessness

27   determination) (citing Fry v. Pliler, 551 U.S. 112, 119 (2007)).

28   ////

1    The state court held any error harmless because it was not "reasonably probable" that the

2    result of petitioner's trial would have been different had Officer Fernandez not given the opinion

3    testimony.  The court cited no federal authority for its holding.  It cited two state court cases -

4    People v. Watson, 46 Cal. 2d 818, 836 (1956) and People v. McNeal, 46 Cal. 4th 1183, 1188,

5    1203 (2009).  In Watson, the California Supreme Court set out the state's harmless error standard

6    for trial court errors.  That test requires the state court to evaluate "whether it is reasonably

7    probable that a result more favorable to [the appellant] would have been reached absent the

8    error."  46 Cal. 2d at 836.  The California Supreme Court in Neal applied the Watson test.  46

9    Cal. 4th at 1188, 1203.

10    The test set out in Watson is not the harmless error test used on direct review of federal

11    constitutional errors. The test for the harmlessness of federal constitutional errors is whether the

12    error was harmless beyond a reasonable doubt.  See Chapman v. California, 386 U.S. 18, 24

13    (1967).  Accordingly, the state court applied an incorrect standard of review and its decision was

14    "contrary to" the clearly established rule of Chapman.  In this situation, this court should review

15    petitioner's due process claim de novo.  Frantz, 533 F.3d at 735.

16    For the reasons set forth in the prior section, this court finds the admission of Officer

17    Fernandez's opinion testimony did not render petitioner's trial fundamentally unfair.  There was

18    ample evidence, as described above, besides Officer Fernandez's testimony that Megan was in

19    fear for "a period of time that extends beyond what is momentary, fleeting, or transitory."  People

20    v. Allen, 33 Cal. App. 4th 1149, 1156 (1995).  Officer Fernandez's brief statement of opinion

21    would not have affected the jurors' determination that Megan was in sustained fear of petitioner.

22    Accordingly, petitioner's due process challenge to the admission of Officer Fernandez's

23    testimony may also be denied on its merits.

24    ////

25    ////

26    ////

27    ////

28    ////

14

**B**.  **Whether the cumulative prejudicial effect of two critical errors violated petitioner's due process rights**

1.  Petitioner's argument

Here, as in the California Court of Appeal, petitioner "contends the cumulative effect of the errors of denying [his] motion for a mistrial after Nicole's testimony about visiting [him] and in admitting [Officer] Fernandez's testimony was prejudicial." Faulkner, 2014 WL 1678611, at *5.  Petitioner "claims Nicole's testimony made clear that [he] was in custody during the trial[]. Id.  Thus, "the jurors . . . reasonably believe[d] [he] was too dangerous to be released, and more readily believe[d] he committed the acts with which he was charged."  Id.

2.  Nicole's testimony

"[PROSECUTOR]: In fact, after the [petitioner] was arrested for what he did on August 4, you visited him twice, right?

"[NICOLE]: Yes, I did.

"[PROSECUTOR]: You visited him even most recently on the 14th of this month for 45 minutes; isn't that right?

"[NICOLE]: Yes, I did.

"[PROSECUTOR]: Discussed his case with him?

"[NICOLE]: No, not really.  No, not in particular.

"[PROSECUTOR]: And in September, you visited him.  That would be on the 2nd of September.  You went in and visited him for 20 minutes; isn't that right?

"[NICOLE]: Yes, I did."

Faulkner, 2014 WL 1678611, at *5.

3.  The trial court's response to petitioner's objection

"At that point in the examination, the trial court interrupted and held proceedings outside the presence of the jury."  Id.  "The trial court advised Nicole the jury was unaware [petitioner] was in custody and to be sure she did not inadvertently provide testimony that would inform the jury of that fact."  Id.  "Defense counsel made a motion for mistrial based on prosecutorial misconduct."  Id.  "He argued the obvious inference of the prosecutor's questioning, with specific

15

1    dates and times of visits, 'is that [petitioner] was in custody on [those dates] and that he's in

2    custody now, which is something that shouldn't be before this jury.'" Id.  "The trial court replied,

3    'I disagree that it is an obvious inference that the [petitioner] is in custody.  He was—[the

4    prosecutor] asked questions about these visits.  Like yourself, I became concerned that we were

5    going to start talking about jail time.  That's why I called a recess and brought you both up to the

6    bench . . . [¶] Obviously, the defendant is in civilian clothing, there's no indication he's in

7    custody.  And reference has not been made to him having been in custody.'" Id.

8              4.    The Court of Appeal's response to petitioner's objection

9          The Court of Appeal rejected petitioner's second claim, reasoning:

10         Some references to a defendant's custodial status can impair the presumption of
           innocence, violating his or her rights to due process and a fair trial.  (*Estelle v.*
11         *Williams* (1976) 425 U.S. 501 [48 L. Ed. 2d 126]; *People v. Bradford* (1997) 15
           Cal. 4th 1229.)  In *Bradford*, the prosecutor questioned a witness during direct
12         examination about her continued friendship with defendant in an attempt to reveal
           bias.  (*Bradford*, at p. 1335.)  He asked whether she had given the defendant
13         anything in the last month, to which she replied, "'Like what can I give him,
           writing paper?'"  (*Ibid.*)  The California Supreme Court rejected the claim of
14         misconduct, as "[t]he prosecutor did not refer expressly to the circumstance that
           defendant was in custody in questioning [the witness] concerning her continuing
15         ties to defendant, and, as the trial court found, the single, spontaneous comment
           made by [the witness] did not necessarily raise the inference that defendant was in
16         fact in custody.  Even if it had, however, an isolated comment that a defendant is
           in custody simply does not create the potential for the impairment of the
17         presumption of innocence that might arise were such information repeatedly
           conveyed to the jury."  (*Bradford*, at p. 1336.)
18

19

20         Here, as noted by the trial court, there was no express reference to [petitioner]'s
           custodial status, [petitioner] remained in civilian clothing and there were no other
21         indications he was in custody.  We are not persuaded that the jury would have
           necessarily construed the prosecutor's questions to mean that [petitioner] was in
22         custody.  Nonetheless, to the extent the questions did raise that inference, it was
           just an inference, and a comparatively minor one when taken in the context of the
23         strong evidence of [petitioner's] guilt.  As with the isolated comment in *Bradford*,
           this inference did not irreparably damage [petitioner's] chance of receiving a fair
24         trial.

25

26         Based on our conclusion that there was no error in the denial of the motion for a
           mistrial, we also reject [petitioner's] claim of cumulative error.  "We have
27         considered each claim on the merits, and neither singly nor cumulatively do they

28   ////

16

1    establish prejudice requiring the reversal of the convictions."  (*People v. Lucas*
2    (1995) 12 Cal. 4th 415, 476.)

3    Faulkner, 2014 WL 1678611, at *5–6.

4                5.        Discussion

5           "The Supreme Court has clearly established that the combined effect of multiple trial

6    court errors violates due process where it renders the resulting criminal trial fundamentally

7    unfair."  Parle v. Runnels, 505 F.3d 922, 927 & n.5 (9th Cir. 2007) (citing cases).  "The

8    cumulative effect of multiple errors can violate due process even where no single error rises to the

9    level of a constitutional violation or would independently warrant reversal."  Id. at 927 & n.6

10   (citations omitted).

11          "Under traditional due process principles, cumulative error warrants habeas relief only

12   where the errors have so infected the trial with unfairness as to make the resulting conviction a

13   denial of due process."  Id. (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  "Such

14   infection occurs where the combined effect of the errors had a substantial and injurious effect or

15   influence on the jury's verdict."  Id. (citing Brecht, 507 U.S. at 637).   "In simpler terms, where

16   the combined effect of individually harmless errors renders a criminal defense far less persuasive

17   than it might [otherwise] have been, the resulting conviction violates due process."  Id. (citing

18   Chambers v. Mississippi, 410 U.S. 284, 302–03 (1973)).  Nevertheless, "[i]f the evidence of guilt

19   is otherwise overwhelming, the errors are considered harmless and the conviction will generally

20   be affirmed."  Id. at 928 (citation omitted).

21          Here, the Court of Appeal reasonably concluded that the cumulative effect of the two

22   alleged errors did not violate petitioner's due process rights.  The Court of Appeal reasonably

23   concluded that Nicole's testimony did not necessarily lead the jury to conclude that petitioner was

24   in custody.  Nicole never said where she had visited petitioner, and jurors had no reason to

25   believe that he was in custody at the time of trial since he was dressed in civilian clothes.  The

26   Court of Appeal also reasonably concluded that any inference that he was in custody was

27   comparatively minor considering the strong evidence of his guilt.  As discussed, that evidence

28

17

1  included statements Megan made to Officer Fernandez at the scene and in her 911 call.  It also

2  included Officer Fernandez's observations of her demeanor and behavior, and Nicole's

3  observations of her reaction to petitioner's conduct.

4       Additionally, the Court of Appeals reasonably "reject[ed] [petitioner's] claim of

5  cumulative error."  Faulkner, 2014 WL 1678611, at *6.  Petitioner has not shown that the

6  combined effected of the alleged errors made his defense far less persuasive than it otherwise

7  might have been.  For starters, he has not shown that the admission of Officer Fernandez's

8  testimony or the denial of his motion for a mistrial constituted errors.  And, in any event, there

9  was "strong evidence of [his] guilt."  Id.  Indeed, even if these actions constituted errors, the

10  errors would be harmless because the evidence of his guilt is "overwhelming."  Parle, 505 F.3d at

11  928 (citation omitted).  Accordingly, claim (2) lacks merit.

12       C.    **Whether the prosecutor violated petitioner's constitutional rights through**
13               **his charging decisions and failure to excuse a biased juror**

14         1.    Petitioner's arguments

15       In his state habeas petition,[5] petitioner contends that the prosecutor violated his

16  constitutional rights by pursuing criminal charges and not a drug diversion program.  (Doc. 7 at

17  5–11.)  To support this contention, he asserts that: (1) he has a drug problem; (2) Megan testified

18  that she wanted him arrested because of his drug problems, not because of the threats; (3) the case

19  was weak; and (4) people in the community, including Megan, wanted him to enter a drug

20  diversion program.  (Id. at 5–6, 8.)  Further, he asserts that the prosecutor's decision violated

21  equal protection because he is a member of an allegedly protected class of people "called drug

22  users or . . . 'Dope Addicts.'"  (Id. at 9–10.)

23       Petitioner also contends that the prosecutor violated his "constitutional rights to a fair trial

24  and impartial jury" by allowing a biased juror to remain on the panel.  (Id. at 11–12.)  He asserts

25  that an unidentified juror worked as a manager at a Home Depot from which he shoplifted.  (Id.)

26  Further, he asserts that "this juror was prejudiced by [his] past criminal behavior."  (Id.)

27
28      [5]  The court will assume that petitioner meant to incorporate the arguments from his state habeas petition into his federal habeas petition.  Cf. ECF No. 1 at 5.

1  Additionally, he asserts that "[t]his influential member of the community most likely influenced

2  the prosecution in taking such a hard line stance towards how [he] was charged, and how the trial

3  was proceeded with, not to mention how [he] was sentenced."  (Id.)

>               2.        Deference under § 2254(d)

5        The California Supreme Court rejected this claim without comment.  "When a federal

6  claim has been presented to a state court and the state court has denied relief, it may be presumed

7  that the state court adjudicated the claim on the merits in the absence of any indication or state-

8  law procedural principles to the contrary."  Harrington v. Richter, 562 U.S. 86, 99 (2011).  "This

9  presumption may be overcome when there is reason to think some other explanation for the state

10  court's decision is more likely."  Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803

11  (1991)).

12        Where the state court reaches a decision on the merits but provides no reasoning to

13  support its conclusion, a federal habeas court independently reviews the record to determine

14  whether relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v. Thompson, 336

15  F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the

16  constitutional issue, but rather, the only method by which [the court] can determine whether a

17  silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

18  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

19  reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

20               3.        Discussion

21                    a.        Charging decision

22        "In our system, so long as the prosecutor has probable cause to believe that the accused

23  committed an offense defined by statute, the decision whether or not to prosecute, and what

24  charge to file . . . , generally rests entirely in his discretion."  Bordenkircher v. Hayes, 434 U.S.

25  357, 364 (1978).  At the same time, a prosecutor's charging discretion is "'subject to

26  constitutional constraints.'"  United States v. Armstrong, 517 U.S. 456, 464 (1996) (citation

27  omitted).  "One of these constraints, imposed by the [Equal Protection Clause] . . . is that the

28  decision whether to prosecute may not be based on an unjustifiable standard such as race,

1   religion, or other arbitrary classification[.]"  Id. (citations omitted).  Another is that a prosecutor

2   may not engage in "vindictive prosecution" by adding new or more serious charges to punish a

3   person for exercising his constitutional rights.  See United States v. Goodwin, 457 U.S. 368, 372

4   (1982); see also United States v. Robison, 644 F.2d 1270, 1272 (9th Cir. 1981) ("In almost every

5   case in which courts have condemned prosecutions as vindictive, the defendant, after exercising

6   some procedural right, had been confronted with a more serious or an additional charge . . . .").

7   However, absent "clear evidence to the contrary," courts presume that prosecutors make charging

8   decisions within constitutional bounds.  See Armstrong, 517 U.S. at 465.  Furthermore, "[t]he

9   prosecutor may be influenced by the penalties available upon conviction, but this fact, standing

10   alone, does not give rise to a violation of the Equal Protection or Due Process Clause."  United

11   States v. Bachelder, 442 U.S. 114, 125 (1979).

12        Here, the prosecutor enjoyed broad discretion to pursue criminal charges rather than a

13   drug diversion program.  Furthermore, petitioner has neither argued nor shown that the prosecutor

14   charged him to retaliate against him for exercising his right to trial.  Additionally, he has cited no

15   authority, and the court knows of none, proposing that drug addicts are a protected class for equal

16   protection purposes.  See Fields v. Legacy Health Sys., 413 F.3d 943, 955 (9th Cir. 2005) (stating

17   that "race, alienage, national origin, [and] sex" are examples of "protected characteristics" under

18   the Equal Protection Clause).  Moreover, even were this so, he has not shown that his drug

19   addiction motivated the prosecutor to charge him.  Accordingly, the California Supreme Court

20   reasonably rejected this argument.

21              b.      Biased Juror

22        This claim is deficient for several reasons.  First, in his state habeas petition, petitioner did

23   not provide any evidence showing that the unnamed juror managed a Home Depot.  Second, he

24   did not provide any evidence showing that he was arrested for shoplifting at the Home Depot

25   where the juror allegedly worked.  Third, assuming the juror managed a Home Depot from which

26   he shoplifted, he did not provide evidence that the juror knew of the incident.  Fourth, he did not

27   provide evidence that the prosecutor knew of the alleged incident or the alleged familiarity

28   between him and the juror.  Petitioner asserts that the prosecutor "could have known this fact"

1   because he had a duty to "conduct a full investigation into each and every juror prior to the

2   beginning of the trial." (Doc. 7 at 12.)  But petitioner has not identified any authority for this

3   proposition, and the court knows of none, binding or otherwise.  Cf. Standard 3-6.3 Selection of

4   Jurors, ABA Standards for Criminal Justice 3-6.3.  Accordingly, the California Supreme Court

5   reasonably rejected this argument.

6          For these reasons, claim (3) lacks merit.

7          **D.      Whether petitioner's trial and appellate counsel were ineffective**

8          Petitioner bootstraps his fourth claim onto this third.  In his state habeas petition, he

9   contends that his trial counsel was ineffective for failing to persuade the prosecutor to pursue a

10  drug diversion program and challenge the allegedly biased witness.  (Doc. 7 at 14.)  Likewise, he

11  contends that his appellate counsel was ineffective for failing to raise these issues on appeal.  (Id.

12  at 16.)

13               1.      Trial counsel

14         To establish a claim of ineffective assistance of counsel, petitioner must show that his

15  attorney's performance was deficient and that the deficient performance prejudiced his defense.

16  Strickland v. Washington, 466 U.S. 668, 687 (1984).  To prove deficiency, he must show that his

17  attorney's performance "fell below an objective standard of reasonableness" as measured by

18  prevailing professional norms.  Id. at 688.  To prove prejudice, he "must show that there is a

19  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

20  would have been different."  Id. at 694.

21         Regarding the performance prong, courts must "indulge a strong presumption that

22  counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689;

23  see also Premo v. Moore, 131 S. Ct. 733, 739–40 (2011) (citations omitted).  Thus, courts must

24  make every effort "to eliminate the distorting effects of hindsight, to reconstruct the

25  circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

26  perspective at the time."  Strickland, 466 U.S. at 669; see Harrington v. Richter, 562 U.S. 86, 101,

27  107 (2011).  Likewise, courts must "give the attorneys the benefit of the doubt" and

28  "affirmatively entertain the range of possible reasons [defense] counsel may have had for

21

1    proceeding as they did." Cullen v. Pinholster, 563 U.S. 170, 195 (2011) (some alterations

2    omitted).

3         Regarding the prejudice prong, a reasonable probability is "a probability sufficient to

4    undermine confidence in the outcome." Strickland, 466 U.S. at 694. "The likelihood of a

5    different result must be substantial, not just conceivable." Richter, 562 U.S. at 112. "[A] court

6    need not determine whether counsel's performance was deficient before examining the prejudice

7    suffered by the defendant as a result of the alleged deficiencies." Strickland, 466 U.S. at 697. "If

8    it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . .

9    that course should be followed." Id.

10        It is "all the more difficult" to prevail on a Strickland claim under § 2254(d). Richter, 562

11   U.S. at 105. As the standards that Strickland and § 2254(d) create are both "highly deferential,"

12   review is "doubly" so when the two apply in tandem. Id. (citation omitted). Thus, "[w]hen §

13   2254(d) applies, the question is not whether counsel's actions were reasonable." Id. Rather,

14   "[t]he question is whether there is any reasonable argument that counsel satisfied Strickland's

15   deferential standard." Id.

16        Here, there is an argument that trial counsel's assistance was reasonable. As discussed

17   earlier, prosecutors enjoy wide latitude in charging; petitioner has not shown that the prosecutor's

18   decision to pursue criminal charges rather than a drug diversion program was improper. And his

19   assertion that his counsel could have persuaded the prosecutor to do otherwise is speculative. See

20   Brown v. Wenerowicz, 663 F.3d 619, 634 (3d Cir. 2011) ("Speculation is not enough under

21   AEDPA."); Kinnamon v. Scott, 40 F.3d 731, 735 (5th Cir. 1994) (speculative arguments that

22   counsel could have obtained the desired result are insufficient for habeas relief).

23        There is also a reasonable argument that trial counsel was not ineffective for failing to

24   challenge the allegedly biased juror. Again, petitioner did not provide any evidence showing that

25   he shoplifted from a Home Depot or that the unspecified juror worked there or knew of his

26   alleged shoplifting. Therefore, he has not shown that his counsel knew that the alleged juror was

27   biased against him. Further, while he suggests that his counsel should have more thoroughly

28   investigated the juror, he does not explain how counsel was deficient in this regard. See Jones v.

22

1    Gomez, 66 F.3d 199, 205 (9th Cir. 1995) ("[C]onclusory suggestions that . . . trial . . . counsel

2    provided ineffective assistance fall far short of stating a valid claim of constitutional violation.").

3            Additionally, there is a reasonable argument that counsel's failure to investigate the

4    allegedly biased juror did not prejudice petitioner.  As discussed, the evidence of his guilt was

5    strong.  Therefore, even had counsel successfully challenged the juror, there is no reasonable

6    probability that the outcome of the trial would have been different.[6]

7            For these reasons, petitioner has not shown that his trial counsel was ineffective.

8                          2.      Appellate counsel

9            The Strickland standard applies to appellate counsel as well as trial counsel.  Smith v.

10   Murray, 477 U.S. 527, 535–36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433–44 (9th Cir.

11   1989).  However, an indigent defendant "does not have a constitutional right to compel appointed

12   counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional

13   judgment, decides not to present those points."  Jones v. Barnes, 463 U.S. 745, 751 (1983).

14   Counsel "must be allowed to decide what issues are to be pressed."  Id.  Otherwise, the ability of

15   counsel to present the client's case in accord with his or her professional evaluation would be

16   "seriously undermine[d]."  Id.; see also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998)

17   (citing cases) (Counsel is not required to file "kitchen-sink briefs" because it "is not necessary,

18   and is not even particularly good appellate advocacy."); Pollard v. White, 119 F.3d 1430, 1435

19   (9th Cir. 1997) ("A hallmark of effective appellate counsel is the ability to weed out claims that

20   have no likelihood of success, instead of throwing in a kitchen sink full of arguments with the

21   hope that some argument will persuade the court."); Miller v. Keeney, 882 F.2d 1428, 1434 &

22

23   [6]  Under Strickland, prejudice is presumed in certain cases.  Bell v. Cone, 535 U.S. 685, 695
     (2002) (citation omitted).  However, "no Supreme Court precedent holds that a failure to
24   investigate potential juror bias presents structural error . . . ."  Sims v. Rowland, 414 F.3d 1148,
     1153 (9th Cir. 2005).  Granted, the Ninth Circuit has stated that "[t]he presence of a biased juror
25   cannot be harmless; the error requires a new trial without a showing of actual prejudice."  Dyer v.
     Calderon, 151 F.3d 970, 973 (9th Cir. 1998).  However, circuit court precedent may not be "used
26   to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule
     that [the Supreme] Court has not announced."  Marshall, 133 S. Ct. at 1450.  Thus, counsel's
27   failure to investigate the allegedly biased juror is not presumptively prejudicial under AEDPA.
     Sims, 414 F.3d at 1153 (citation omitted).
28

1  n.10 (9th Cir. 1989) (citing authorities) ("[T]he weeding out of weaker issues is widely

2  recognized as one of the hallmarks of effective appellate advocacy.").

3        Further, it is well settled that appellate counsel has no obligation to raise meritless

4  arguments on a client's behalf.  See Strickland, 466 U.S. at 687 (requiring a showing of deficient

5  performance and prejudice); see also Moormann v. Ryan, 628 F.3d 1102, 1107 (9th Cir. 2010)

6  (citation omitted) ("[A]ppellate counsel did not act unreasonably in failing to raise a meritless

7  claim . . . , and [the petitioner] was not prejudiced by appellate counsel's omission."); Turner v.

8  Calderon, 281 F.3d 851, 872 (9th Cir. 2002) (citations omitted) ("A failure to raise untenable

9  issues on appeal does not fall below the *Strickland* standard.").  To establish prejudice, petitioner

10  must demonstrate that "there is a reasonable probability that [he] would have won the appeal" but

11  for appellate counsel's errors.  Miller, 882 F.2d at 1434 n.9.

12        The performance and prejudice "prongs partially overlap when evaluating the

13  performance of appellate counsel."  Id. at 1434.  "Appellate counsel will . . . frequently remain

14  above an objective standard of competence (prong one) and have caused her client no prejudice

15  (prong two) for the same reason—because she declined to raise a weak issue."  Id.

16        Here, there is a reasonable argument that appellate counsel was not ineffective.  As

17  explained, claim (3) lacks merit.  See supra Part III(C)(3).  Thus, appellate counsel had no

18  obligation to raise it on appeal.  For the same reason, there is no reasonable probability that

19  petitioner would have won the appeal had appellate counsel raised claim (3).  Thus, appellate

20  counsel was not ineffective.

21        For these reasons, claim (4) lacks merit.

22  **IV.    CONCLUSION**

23        Petitioner has failed to establish that the decisions of the state courts rejecting his claims

24  were contrary to, or an unreasonable application of, clearly established federal law or an

25  unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).  Because he has not satisfied

26  the requirements of § 2254(d), IT IS HEREBY RECOMMENDED that his petition for a writ of

27  habeas corpus be denied.

28  ////

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

Dated: July 27, 2017

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:11
DLB1/prisoner-habeas/faul1485.fr

25